IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION


| | | |
|---|---|---|
| PEOPLESSOUTH BANK, a<br>Georgia Banking<br>Corporation, | ) <br> ) <br> ) <br> ) | |
|     Plaintiff, | ) <br> ) | |
|     v. | ) <br> ) <br> ) | CIVIL ACTION NO.<br>1:11cv36-MHT<br>(WO) |
| FARMER & MALONE, P.A.,<br>an Alabama Legal<br>Professional Association, | ) <br> ) <br> ) <br> ) | |
|     Defendant. | ) | |


## OPINION

Plaintiff PeoplesSouth Bank ("PSB") charges defendant
Farmer & Malone, P.A., a law firm, with legal malpractice
under the Alabama Legal Services Liability Act ("ALSLA"),
1975 Ala. Code § 6-5-571 et seq.  The bank contends that
the law firm provided an inaccurate title opinion on a
piece of land used as collateral.  In addition to
contesting the merits, the law firm submits that the
bank's claim is barred by the statute of limitations.

This court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

Based on the evidence presented at a bench trial, the court finds that the bank's claim is barred by the statute of limitations.[1]

## I.  FINDINGS OF FACT

This litigation arises from a land deal gone south. In late spring 2007, Judd Lisenby and Nicole Lisenby sought a loan from PSB to pay off debt related to their farming operations.  To secure a $ 858,402.25 loan, Judd Lisenby offered as collateral an approximately 550-acre tract of land owned by his father.  According to an appraisal conducted in March 2007, the property was valued at $ 1,230,750.

Despite the land's value, PSB insisted that the loan have a guarantor in addition to making the land

---

1. This consolidated action was tried simultaneously with PeoplesSouth Bank v. North, Civ. No. 1:11cv176-MHT. The North case, however, was tried before a jury and settled mid-trial.

collateral.  A friend of Judd Lisenby, Charles North, agreed to be a guarantor.  With that condition met, the bank agreed to the loan.

During the loan-negotiation process, PSB hired the law firm of Farmer & Malone to conduct a title search of the property.  The bank and the law firm were repeat players.  The president of the bank's local branch, Dianne Thomas, had frequently worked with attorney James Farmer.  Over the course of several years, Thomas and Farmer developed an amicable professional relationship and each considered the other a friend.

As a matter of routine, banks insist on a title search to determine whether a deed is valid and whether a property has any encumbrances or liens against it. Because these records are not always online, a title search requires traveling to a county courthouse and delving through numerous records.  A title search is essential in calculating a property's value.

3

Like many lawyers in the Wiregrass Area of Alabama, Farmer's law firm uses independent abstractors to perform title searches. For this land deal, Farmer hired Cindy Barnes to conduct the title search.

During her investigation, Barnes uncovered evidence of an old timber lease on the property. A timber lease permits a logging company to cut down trees and, therefore, reduces a property's value. Barnes placed a handwritten note in her report stating that there was a timber lease assigned from Judd Lisenby's father to a logging company in 1961. Barnes further notes that the lease was assigned to other logging companies in 1962 and 1976. Barnes concludes by stating: "See if Lease is still open (If so I will get copies). Something was done in 2004 ... which states lease is in Plum Creek Timberland." Barnes Report (PSB Exhibit 42) at Barnes 025. Barnes included this handwritten note in her final, typed report to attorney Farmer. However, the first page

4

of Barnes's reports--which contains a summary of her findings--makes no mention of a timber lease.

Unfortunately for everyone involved, Barnes's handwritten note about the timber lease was never received by attorney Farmer. Barnes sent 23 pages by fax to his office. A fax transmittal report indicates that only 22 pages were received. The court credits Farmer's testimony that the missing page was Barnes's handwritten note about the timber lease.

On June 6, 2007, Farmer provided Thomas and the bank a preliminary title opinion without any reference to a timber lease on the property. Based on the preliminary title opinion, the bank issued the Lisenbys a loan--with North as the guarantor--on June 11, 2007. Shortly thereafter, on June 14, 2007, the law firm issued a final title opinion similarly omitting the timber lease. Both title opinions take the form of letters from attorney Farmer. They state, in pertinent part, that: "I have examined the public records in the Offices of the Judge

5

of Probate and Revenue Commissioner of Dale County, Alabama, from this date and going back for a period of thirty-five (35) years." Preliminary Title Opinion (Joint Exhibit 10) at 1.

Two years later, in June 2009, the Lisenbys defaulted on their loan and filed for bankruptcy. Their bankruptcy triggered the guaranty agreement, and PSB demanded the balance of the loan from North. Pursuant to the guaranty agreement, North was entitled to have the 550-acre property sold at foreclosure (or credited to his account by a deed-in-lieu of foreclosure) before the bank could recover any remaining balance. Because the 2007 appraisal of the property valued it significantly higher than the loan's principal, North believed that the guaranty agreement could be paid off by selling the land. The discovery of the timber lease, however, significantly reduced the property's value.[2]

---

2. When PSB accepted a deed-in-lieu of foreclosure for the property in May 2012, the land was valued at $ 370,000.

The Lisenbys' attorney brought the timber lease to the Farmer & Malone's attention on September 15, 2009, when he faxed a copy to attorney Farmer.  The timber lease was assigned in 1961, outside of the title opinion's 35-year coverage.  Nonetheless, Farmer immediately contacted Barnes and Thomas.

Farmer learned from Barnes that she had intended to include the handwritten note about the timber lease in the faxed report.  Farmer and Barnes quickly confirmed that only 22 pages had been sent.  Barnes recorded this conclusion with a handwritten notation on the top of the missing page.

It is undisputed that Farmer called Thomas on September 15, 2009, to inform her of the timber lease's existence.  Farmer also faxed Thomas a copy of the timber lease.  When Thomas asked why the title opinion had missed the timber lease, Farmer replied that his opinion

extended back only 35 years and that the timber lease had been recorded well before that.[3]

There was conflicting testimony as to what was stated during the conversation about Farmer's role in the title opinion's mistake.  Farmer testified that he informed Thomas that he had a conflict and asked if she still wanted him to represent the bank.  He contended that she replied in the affirmative and he continued to represent the bank.[4]  He further testified that she had been

---

3.  Thomas also testified that, at some point in August 2009, North approached her and informed her of the timber lease.  Thomas stated that she did not believe North because he contradicted Farmer's title opinion.

Judd Lisenby testified that he informed Thomas of the timber lease while negotiating the loan agreement in 2007.  Lisenby claimed that Thomas dismissed the importance of the timber lease because the property was the collateral.

For purposes of resolving this case on a statute-of-limitations ground, the court finds it sufficient that Farmer put Thomas on notice of the timber lease's existence on September 15, 2009.  As such, the court need not decide the exact moment that Thomas was informed of the timber lease.

4.  Farmer neglected to memorialize this notice of

(continued...)

involved in a similar legal malpractice claim in the past and that she should have been aware that the "conflict" comment indicated that the bank had a legal claim against the law firm.   Thomas's testimony paints a different picture: she contends that Farmer did not inform her of any conflict.[5]  Based on the testimony, the court credits Farmer's account of the September 15, 2009, conversation. Farmer informed Thomas of a conflict, and she reasonably should have known that PSB had a malpractice claim against the law firm.

On January 14, 2010, North's attorney sent Farmer a letter detailing the reasons why the timber lease should have been uncovered.   The letter points to various tax receipts and amendments to the deed that were made within the 35-year period of the title opinion.   Farmer did not immediately forward this letter to the bank.

_____

(...continued)
conflict in writing.

5.   PSB further complains that Farmer failed to affirmatively disclose that it had a malpractice claim against his firm.

In June 2010, PSB retained new counsel, Joseph Adams, to handle the Lisenby case and the Farmer & Malone malpractice claim. On June 24 and 25, 2010, Adams charged the bank for 4.9 hours of work on legal-services liability. Adams Billing Form (Farmer & Malone Exhibit 5) at 1. At trial, Adams testified that his research was checking into whether a malpractice claim was lurking in the shadows. He averred that he did not conclude that the bank had a malpractice claim against Farmer & Malone until he received a copy of North's attorney's letter in September 2010, when attorney Farmer finally turned over his case file.

The bank filed its complaint against the law firm on January 14, 2011.


## II.   CONCLUSIONS OF LAW

PSB brings a claim of legal malpractice against the law firm for failing to discover the timber lease. Because this court hears this case pursuant to diversity

10

jurisdiction, the bank's legal-malpractice claim is governed by Alabama law. Before this court can consider the merits, it must first address the law firm's contention that this case is barred by the statute of limitations.

Section 6-5-574(a) of the ALSLA states, in relevant part, that:

> "All legal service liability actions against a legal service provider must be commenced within two years after the act or omission or failure giving rise to the claim, and not afterwards; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; provided, further, that in no event may the action be commenced more than four years after such act or omission or failure."

1975 Ala. Code § 6-5-574(a). The ALSLA also provides that certain enumerated provisions concerning "the computation of statutory periods of limitation" apply. Id. § 6-5-574(b). One of these provisions, § 6-2-3, reads:

11

> "In actions seeking relief on the ground
> of fraud where the statute has created
> a bar, the claim must not be considered
> as having accrued until the discovery by
> the aggrieved party of the fact
> constituting the fraud, after which he
> must have two years within which to
> prosecute his action."

1975 Ala. Code § 6-2-3.

Stated simply, legal-malpractice claims have a two-year statute of limitations.  However, if the cause of action was not immediately discovered, the plaintiff normally has six additional months to bring suit, but if fraud concealed the claim, the plaintiff has an additional two years to file a complaint.  Alabama law places an absolute bar on actions brought after four years.  See Coilplus-Alabama, Inc. v. Vann, 53 So. 3d 898, 904 (Ala. 2010) (summarizing the statutory scheme).[6]

The Supreme Court of Alabama has explained that ALSLA's two-year statute of limitations begins to run at

_____

6   The ALSLA's four-year maximum cap for bringing suit is not implicated in this litigation.

12

the time PSB relied on the faulty title opinion.  See

Sirote & Permutt, P.C. v. Bennett, 776 So. 2d 40, 45

(Ala. 2000) (holding that malpractice suit against lawyer

for faulty title opinion accrues on the "date that the

plaintiffs first suffered legal damage for which they

would have been entitled to bring an action for

damages"); see also Kachler v. Taylor, 849 F. Supp. 1503,

1511-12 (M.D. Ala. 1994) (Thompson, C.J.).  PSB's claim

regarding the faulty title opinion accrued on June 11,

2007, when it relied on the preliminary title opinion and

closed the loan with the Lisenbys.  Because this suit was

filed in January 2011, the claim is untimely.[7]

_____

     7.  The court notes that Sirote & Permutt relies on
the "damages" rule for determining the accrual of a
statute of limitations.  Sirote & Permutt, 776 So. 2d at
44-45 & n.5.  The Supreme Court of Alabama has recently
shifted away from this doctrine and adopted an
"occurrence" rule: a claim accrues when the act or
omission giving rise to liability occurs.  Denbo v.
DeBray, 968 So. 2d 983, 989 (Ala. 2006).  In this case,
the choice between the "damages" and "occurrence" rules
is of no consequence.  Under the occurrence rule, the
claim accrued when Farmer & Malone issued its preliminary
title opinion: June 6, 2007, only five days before the
"damages" rule date.

To the extent that PSB seeks shelter under § 6-5-574(a)'s six-month discovery rule, the court concludes that the bank was on notice of a claim against the law firm by <u>at least</u> June 24, 2010. By that time, the bank had retained another attorney who started researching ALSLA claims. It strains credulity to believe that PSB--a sophisticated, multi-state banking corporation--could be ignorant of a malpractice claim by that point. Since this suit was filed in January 2011, the bank cannot rely on the six-month discovery provision for tolling the statute of limitations.

PSB's central claim is that attorney Farmer fraudulently concealed certain facts and, therefore, it is entitled to the two-year statute of limitations extension upon discovery of the fraud. Because the court concludes that the bank was on notice of a malpractice claim when Farmer informed Thomas of the conflict of interest on September 15, 2009, the two-year statute of limitations would make this case timely.

14

At trial, the court requested that PSB's counsel
clarify her contentions for why the bank is entitled to
the two-year tolling of the statute of limitations.  The
bank responded with four reasons why § 6-2-3's additional
two years apply.  The court addresses each in turn,
keeping in mind that a plaintiff must satisfy the
"reasonable reliance" standard to trigger § 6-2-3's
tolling provision.  <u>Denbo</u>, 968 So. 2d at 991.

First, PSB submits that the title opinion's 35-year
coverage statement is fraudulent.  The bank believes
that, because parts of the title opinion reference a deed
from 1947, the standard of care requires that the title
opinion cover from that period forward.  Transcript at
97.  The bank ignores the plain language of the title
opinion, which expressly states that it encompasses "from
this date and going back for a period of thirty-five (35)
years."  Preliminary Title Opinion (Joint Exhibit 10) at
1.  Moreover, when the court asked Thomas whether she
cared about the temporal coverage of the title opinion or

15

whether there were any encumbrances (such as a timber lease), she unequivocally replied that she was only looking for the latter.  Transcript at 132-33.  Given the title opinion's express temporal limitation and Thomas's testimony, PSB cannot reasonably rely on a belief that the investigation covered a 46- or even 60-year period. In any event, that Farmer went back further than 35 years is hardly a basis to complain.

Second, PSB believes that attorney Farmer's statement in September 2009 that his title opinion covered only 35 years was a fraud. Id. at 95-96.  This claim fails for the same reasons as the prior argument.

Third, PSB believes that the following statement is fraudulent: "I have examined the public records in the Offices of the Judge of Probate and Revenue Commissioner of Dale County." Preliminary Title Opinion (Joint Exhibit 10) at 1.  According to the bank, Farmer improperly implied that he had personally gone to the relevant public records offices when, in fact, he used an

16

independent abstractor to conduct title searches. Transcript at 96. As an initial matter, the court is skeptical that Farmer's invocation of standard principles of agency can be construed as fraudulent. But in any event, Thomas's testimony forecloses the bank's argument. At trial, the following exchange occurred:

> The Court: "Would it have made a difference whether [Farmer] had had someone else to do that work as long as he signed of on it?"
>
> Thomas: Well, no, because he--I mean, you know, he is the one that gave me the title opinion. Jim [Farmer] is the one that I dealt with. Jim is the one I depended on. And the--you know, he had a partner. I didn't--I mean, I didn't--we never talked about Cindy Barnes."
>
> The Court: "I mean, is that something that as a bank you were concerned about? Whether he used someone else to actually go to the courthouses and check on these?"
>
> Thomas: "As long as Jim Farmer gave me a title opinion, my confidence, my trust, and I knew that he was giving me a title opinion that was right."

Id. at 175-76.  Thus, it is apparent that the bank did not rely on a belief that Farmer had gone to the courthouses to conduct the title search.

Finally, PSB submits that attorney Farmer had a duty to disclose that there was a potential malpractice claim against him, not merely that there was a conflict of interest.  Transcript at 96.  Much of this argument hinges on the bank's belief that Farmer did not mention a conflict of interest during his conversation with Thomas on September 15, 2009.  In light of its finding that Farmer did inform Thomas about a conflict, the court concludes that the bank should have been aware that it had a potential malpractice claim against the law firm as of September 15, 2009.  Farmer told Thomas that a conflict of interest existed and inquired as to whether his continued representation of the bank was desired.  He also testified that he had worked with Thomas on a similar case involving legal malpractice and that she had access to in-house counsel.  In light of these

18

considerations, the bank could not reasonably rely on Farmer's failure to state affirmatively that a potential malpractice claim could be brought.

PSB has failed to provide any reason for why § 6-2-3's two-year extension of the statute of limitations should apply to this litigation. The court concludes that the bank should have discovered its malpractice claim on September 15, 2009, and brought suit within six months. Because this action was filed in January 2011, it is barred by ALSLA's statute of limitations.[8]

\* \* \*

In sum, the court finds that PSB's claim against Farmer & Malone is barred by the statute of limitations.

---

8. The court notes that were it to reach the merits, it has considerable doubt concerning Farmer & Malone's primary argument: that the firm is insulated from liability for errors committed by its independent abstractor, Cindy Barnes. The title opinion is authored by the law firm, not an undisclosed abstractor.

19

An appropriate judgment will be entered.

DONE, this the 2nd day of July, 2012.

                        /s/ Myron H. Thompson
                    UNITED STATES DISTRICT JUDGE